UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NORTHPOINTE COMMERCE PARK, LLC,

                         Plaintiff,

            v.

THE CINCINNATI INSURANCE COMPANY,

                         Defendant.

**REPORT AND RECOMMENDATION**

14-CV-587A

## I.  INTRODUCTION

The Hon. Richard J. Arcara has referred this case to this Court under 28 U.S.C. § 636.  (Dkt. No. 11.)  Pending before the Court is a motion (Dkt. No. 6) by defendant The Cincinnati Insurance Company ("Cincinnati") to dismiss the complaint of plaintiff Northpointe Commerce Park, LLC ("Northpointe"), converted by Judge Arcara into a motion for summary judgment.  (Dkt. No. 7.)  Cincinnati wants the complaint dismissed for one or more of several layered reasons: 1) The policy in question requires legal actions to be filed within two years of direct physical loss, and Northpointe did not file its complaint within two years of its loss on May 1, 2011; 2) Even if a second loss occurred on May 3, 2012, as Northpointe claims, the damage duplicated the damage from the first loss and thus falls under the deadline for the first loss; and 3) Northpointe never filed a

formal loss notice for the alleged second loss of May 3, 2012, as required by the policy.

Northpointe opposes Cincinnati's motion. With respect to the first loss of May 1, 2011, Northpointe argues that the policy's language is sufficiently ambiguous that its causes of action did not accrue until Cincinnati denied coverage on May 25, 2012. Northpointe also asserts that a second loss did occur on March 3, 2012, and that the second loss caused damage distinct from the first loss. Finally, Northpointe argues that it did put Cincinnati on notice almost immediately after the second loss, even if it did not file a formal loss notice.

The Court held oral argument on December 17, 2014. For the reasons below, the Court respectfully recommends granting the motion in part to dismiss the complaint with respect to the first loss but denying the motion with respect to the second loss.

## II.    BACKGROUND

This case concerns two windstorms that damaged one of Northpointe's commercial buildings and Northpointe's attempt to claim insurance coverage for the damage. Northpointe is a New York corporation that manages a commercial property (the "Property") at 60 Northpointe Parkway in Amherst, New York. The Property features exterior walls fitted, at least in part, with a skin of Thermolite™ aluminum composite wall panels. Apart from any classification for policy or for legal purposes, the parties do not dispute that two meteorological events

occurred that potentially bear on the pending motion.  On May 1, 2011, a windstorm blew through the area where the Property sits.  Northpointe has submitted information indicating that wind gusts reached as high as 28 mph that day.  On March 3, 2012, a second windstorm blew through the area with wind gusts as high as 63 mph.  These two windstorms prompted Northpointe to invoke an insurance policy that it bought from Cincinnati, an Ohio corporation, on June 8, 2009.

The policy in question contains several provisions that potentially affect the pending motion and the case in general.  Among other definitions, the policy defines a "loss" as "accidental loss or damage" and "specified causes of loss" as including a "windstorm."  (Dkt. No. 6-7 at 10–11.)  The policy defines an "occurrence" as "all loss, damage, or a sequence of loss or damage, casualties or disasters arising from a single happening or event."  (Dkt. No. 6-6 at 24.)  Under the policy, Cincinnati "will pay for direct physical 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss."  (*Id.* at 39.)  "Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the 'loss' is [excluded under various subsequent provisions]."  (*Id.* at 41.)  The policy does not cover any "defect, weakness, inadequacy, fault, or unsoundness in materials used in construction or repair of part or all of any property on or off the 'premises.'"  (*Id.* at 45 Part 3(c)(2).)  When a loss occurs and Northpointe

3

seeks coverage, it has several obligations under the policy. Northpointe must give Cincinnati "prompt notice of the 'loss.'" (Dkt. No. 6-7 at 3.) The policy does not appear to require any particular method of notice or deadline to so; in fact, "[f]ailure to give prompt notice to us, as required

under this Coverage Form, shall not invalidate any claim made by you or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by you or any other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely

notice and that notice was given as soon as was reasonably possible thereafter." (*Id.* at 15.) Northpointe must cooperate with Cincinnati during the ensuing investigation, which includes furnishing information to Cincinnati as requested. (*Id.* at 3.) While Cincinnati investigates a claim, Northpointe must "[t]ake all reasonable steps to protect the Covered Property from further damage." (*Id.*) Finally, the policy contains a limitations provision concerning litigation:

> No one may bring a legal action against us under this Coverage Part unless:
>
> 1. There has been full compliance with all of the terms of this Coverage Part; and
>
> 2. The action is brought within 2 years after the date on which the direct physical "loss" occurred.

(Dkt. No. 6-6 at 35.)

The parties do not dispute the basic chronology of events concerning the first windstorm. As noted above, the first windstorm occurred on May 1, 2011. The record contains no information about any action that Northpointe took, including providing notice, for approximately the next nine months. On February 8, 2012, a commercial roofing contractor named CentiMark gave Northpointe a proposal for assessing and repairing the Property. (Dkt. No. 6-9.)[1] Among other information, the proposal includes photographs of the damaged portions of the Property along with a conclusion that the Property

> has suffered high wind damage on all 4 sides of building. Panel siding system has been hampered which can be seen throughout. Wind has damaged panels w[h]ere they were loose and now has become a safety hazard to anyone walking around building. All seals have been broken throughout wall siding system which will allow water to enter building.

(*Id.* at 17; Dkt. No. 8-2 at 29.) Based on the CentiMark proposal, Northpointe gave its insurance agent a formal loss notice on February 22, 2012. (Dkt. No. 6-8 at 2.) The loss notice listed May 1, 2011 as the date of loss. The insurance agent forwarded the loss notice to Cincinnati, and Cincinnati acknowledged receipt of the loss notice through a letter dated February 29, 2012. (Dkt. No. 6-11.) In the letter, Cincinnati questioned why Northpointe waited so long after the

---

[1] What appears to be an identical copy of the proposal also appears at Docket No. 8-2 at 15–33. For some reason, though, the word "Thermolite™" is redacted from the captions accompanying the photographs in this copy of the proposal. (*Compare, e.g.*, Dkt. No. 6-9 at 6 *with* Dkt. No. 8-2 at 19.)

first windstorm to provide notice.  Nonetheless, after quoting certain portions of the policy, Cincinnati declared that it would investigate the claim.  On May 25, 2012, Cincinnati sent Northpointe a letter denying coverage for the loss date of May 1, 2011.  (Dkt. No. 6-10.)  Cincinnati invoked the exclusion for defects, claiming that "the reported damages were not caused by an isolated wind event but, rather, the system-wide failure of perimeter sealant joints which has caused extensive delamination.  This failure was caused by numerous design defects and improper installation of sealant joints."  (*Id.* at 2.)

While events concerning the first windstorm were running their course, a second windstorm hit the Property on March 3, 2012.  Northpointe never filed a formal loss notice as it did with the first windstorm.  In contrast to the first windstorm, however, Northpointe appears to have provided informal notice to Cincinnati almost immediately.   On March 5, 2012, Northpointe retained National Fire Adjustment Co., Inc. ("NFA"), a Licensed Public Adjuster, to facilitate communications with Cincinnati and to estimate damage from the second windstorm.  On March 6, 2012, representatives from Northpointe, Cincinnati, and NFA met at the Property to inspect the extent of damages.  On May 24, 2012, NFA sent Cincinnati its damage estimate.  (Dkt. No. 8-2 at 9–14.)  Cincinnati never sent Northpointe a letter acknowledging a claim as it did after the first windstorm.  Neither has Cincinnati ever told Northpointe that the meeting of March 6, 2012 failed to constitute "prompt notice" of a loss under the policy.  The

6

denial letter concerning the first windstorm contains no information suggesting that the denial covered the second windstorm.  Northpointe never followed up with Cincinnati regarding the NFA damage estimate and whether a formal claim existed for that estimate.  As recently as oral argument, the parties could not tell the Court definitively whether Cincinnati ever received a second claim to investigate and what the status of any second claim might be.

At this point, the chronology of this case shifted from physical events to litigation events without providing much clarification.  Under the policy, if the first windstorm constituted a discrete "direct physical loss" then the deadline for filing a legal action based on the first windstorm would have been May 1, 2013.  That deadline came and went without incident.  Similarly, if the second windstorm constituted a discrete "direct physical loss" with proper notice to Cincinnati, the deadline for legal action based on the second windstorm would have been March 3, 2014.  Northpointe filed its complaint just a few days before that deadline, on February 28, 2014.  Between May 25, 2012 and February 28, 2014, neither party appears to have done anything regarding the first or the second windstorm.

To summarize, the chronology of events concerning the first and second windstorm looks like this:



Fig. 1. Chronology of events in *Northpointe Commerce Park LLC v. Cincinnati Ins. Co.*, 14-CV-587A.

As mentioned above, Northpointe filed a complaint on February 28, 2014, in New York State Supreme Court, Erie County. The complaint mentions the second windstorm of March 3, 2012 and then the denial of coverage on May 25, 2012, implying that the denial of coverage pertained to the second windstorm. (*See* Dkt. No. 1-2 at 4.) The complaint contains two causes of action. In the first cause of action, Northpointe seeks a declaratory judgment that Cincinnati must provide coverage for damages to the Property. In the second cause of action, Northpointe accuses Cincinnati of breaching the policy by refusing to provide coverage. On July 18, 2014, Cincinnati removed the complaint to this Court.

8

Cincinnati filed its pending motion to dismiss, converted to a motion for summary judgment, on July 25, 2014.  Addressing the first windstorm, Cincinnati compares the May 1, 2011 loss date and the February 28, 2014 commencement of litigation and concludes that the litigation is not timely.  Under the policy, according to Cincinnati, Northpointe would have had to litigate within two years, by May 1, 2013.   As for the second windstorm, Cincinnati approaches it in several ways.  First, Cincinnati denies that a second loss occurred; it received only one formal loss notice, and it notes that NFA's damage estimate incorporates the same proposal that CentiMark prepared after the first windstorm.  Alternatively, Cincinnati argues that even if a second loss occurred, the damage duplicated the damage from the first windstorm and thus does not receive a new two-year limitations period for litigation.  At the conclusion of oral argument, Cincinnati offered one more substitute position: Even if a second loss occurred and Northpointe's complaint were timely relative to that second loss, the complaint remains untimely relative to the first windstorm.

Northpointe opposes Cincinnati's motion in all respects.  Northpointe argues that the definition of "loss" in the policy is sufficiently ambiguous that the causes of action in the complaint did not accrue until the denial of coverage on May 25, 2012.  If the causes of action accrued on May 25, 2012 then the complaint would be timely relative to the first windstorm.  As for the second windstorm, Northpointe argues that it was a separate event that caused separate

9

damage to the Property. Based on the March 6, 2012 meeting, Northpointe asserts that Cincinnati received proper notice of that loss, even without a formal loss notice. At oral argument, Northpointe could not answer whatever happened to the second claim— or why it did not have an answer—if its position were correct.

## III.   DISCUSSION

### A.   *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is

improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

    **B.**    *The First Windstorm*

As a preliminary matter, the apparent blurring of the two windstorms in the complaint requires the Court to consider how many loss events or "occurrences" compose this case. The parties do not dispute that, meteorologically, a windstorm occurred both on May 1, 2011 and March 3, 2012. For policy purposes, though, does this case present one "loss" or "occurrence," or two? The parties do not appear to present a decisive answer. As noted above, the complaint describes only one loss on March 3, 2012—the second windstorm—but then cites the denial of coverage from May 25, 2012, which on its face addressed only the first windstorm. By drafting the complaint this way, Northpointe—whether intentionally or inadvertently—implied that it suffered one continuous loss that did not accrue until the denial of coverage. Cincinnati seized on that implication to argue for dismissal of the entire case as untimely. According to Cincinnati, if only one direct physical loss occurred, and Northpointe filed its complaint more than two years after that direct physical loss, then Northpointe violated the provision of the policy requiring any legal action to occur within two years of the date of direct physical loss. To counter Cincinnati's

arguments, Northpointe modified the position presented on the face of the complaint, arguing that two separate losses occurred and that the damage to the Property did not occur entirely because of the first windstorm.

Case law addressing multiple insurance "occurrences" offers some guidance. "The cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is that the intentions of the parties should control. Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided. As we have stated before, the meaning of particular language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (internal quotation marks and citations omitted). In *Newmont*, heavy snowfall caused two separate sections of roof to collapse between three and 17 days apart. The Second Circuit upheld a jury's finding of two distinct occurrences because, *inter alia*, the jury had received evidence that the two sections were structurally separate and that the second collapse did not flow from the first. *See* 784 F.2d at 137 (summarizing trial evidence that "simply indicates that the second collapse was not a consequence of the first because each half of the concentrator was structurally distinct and capable of supporting a weight of ice

and snow independent of the other"). Under these circumstances, "the parties here must have intended to provide coverage for property damage each time it occurred unexpectedly and without design, unless the damage occurring at one point in time was merely part of a single, continuous event that already had caused other damage. If we looked only to the cause of the damage, as [defendant insurers] would have us do, it would lead to the absurd result that the collapse of the roof of one building caused on one day by a snowstorm would be considered the same occurrence as an entirely unrelated collapse days later of the roof of another building located several miles away simply because the same snowstorm was the cause of both collapses." *Id.* at 136-37. Another case that gives the Court some guidance is *World Trade Ctr. Properties, L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154 (2d Cir. 2003), *abrogated in part on other grounds by Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006). In *World Trade*, the Second Circuit grappled with an unfortunately necessary and practical question stemming from the September 11, 2001 terrorist attacks: Was there a question of fact regarding whether those attacks constituted one insurance occurrence or two? Assessing a payment provision for "Covered Cause of Loss" essentially identical to Cincinnati's, the Second Circuit found a question of fact where "[a] jury construing this language . . . could reasonably conclude that the 'event' that triggers coverage is the Covered Cause of Loss,

rather than the damage itself.  It also could find that the cause of the destruction of the WTC was either the individual impacts caused by each plane or a single coordinated terrorist attack." 345 F.3d at 189.  The Court gleans from these cases that the number of insurance events or "occurrences" will be ambiguous when either 1) one generating event spawns multiple, potentially independent damage events (the *Newmont* case); or 2) the generating event is "multi-layered," that is, it can be assessed at multiple levels of planning, coordination, and execution (the *World Trade* case).

No such ambiguity presents itself here.  Here, two windstorms hit the Property about 10 months apart.  The time between the two windstorms renders any causal relationship between them meteorologically impossible.  As random meteorological events, the windstorms need no review in terms of planning or coordination.  The only features that the two windstorms have in common are that they hit the same the Property and that any damage from the second windstorm may have overlapped any previously existing damage from the first windstorm. These circumstances warrant treating the two windstorms as independent causes of direct physical loss and applying Cincinnati's motion to each windstorm separately.

Having resolved the independence of each windstorm, the Court now proceeds to address Cincinnati's core argument against the first windstorm— that the complaint is untimely relative to that storm.  "The parties to a contract of

insurance may provide for a shorter limitation of actions than that provided in the general Statute of Limitations." *Brandyce v. Globe & Rutgers Fire Ins. Co.*, 168 N.E. 832, 833 (N.Y. 1929); *accord Myers, Smith & Granady, Inc. v. N.Y. Prop. Ins. Underwriting Ass'n*, 607 N.Y.S.2d 288, 289 (App. Div. 1994), *aff'd*, 647 N.E.2d 1348 (N.Y. 1995), *overruled in part on other grounds by Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741 (N.Y. 1995). Additionally, when parties use the phrase "direct physical loss," the shorter limitations period will run from the date of the physical event that causes property damage. *See Pfeffer v. Harleysville Grp., Inc.*, No. 10-CV-1619 ALC, 2011 WL 6132693, at *7 (E.D.N.Y. Sept. 30, 2011) ("The [*Myers, Smith & Granady*] policy required any action to be brought within two years after the date on which the direct physical loss or damage occurred . . . . The policy language here is identical to the limitations language in *Myers*, thus allowing [defendant insurer] to claim the date of loss to be the date the subject property was damaged.") (internal quotation marks and citations omitted), *aff'd*, 502 F. App'x 28 (2d Cir. 2012); *Lichter Real Estate No. Three, L.L.C. v. Greater N.Y. Ins. Co.*, 841 N.Y.S.2d 93, 94 (App. Div. 2007) ("The policy at issue contained a provision that any legal action for coverage under it must be brought within two years of the date the direct physical loss or damage occurred . . . . Under New York law, the

loss date is the date of the occurrence of the casualty or event insured against.") (internal quotation marks and citations omitted).

  Here, the language in the policy setting a two-year limit for litigation is identical to the language that courts have affirmed as sufficiently specific. As noted above, Cincinnati's policy requires that any litigation related to coverage, or denial of coverage, occur "within 2 years after the date on which the direct physical 'loss' occurred." The specificity of that language avoids the ambiguities that courts have found from the use of the term "loss" or "date of loss" by itself. *Cf. Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 93 (2d Cir. 2010) ("The Fabozzis' policy provides that the limitations period would expire 'two years after the date of loss,' a threshold that New York courts have long regarded as signifying the date on which the claim accrues, not the date on which damage was incurred.") (internal quotation marks and citations omitted). Northpointe has tried to avoid the cases cited above by arguing that Cincinnati introduced ambiguity by having a definition of "loss" apart from the phrase "direct physical loss." The Court does not see how the additional definition makes a difference. Under the policy, "loss" means "accidental loss or damage." This definition does nothing more than eliminate intentional events and limit coverage to events that occur "unexpectedly and without design," the phrase highlighted in *Newmont*. Fusing the two definitions together yields a phrase to the effect of, "direct physical loss occurring

unexpectedly and without design," which would retain the specificity necessary to link the start of the limitations period to the physical event of the first windstorm.

Under these circumstances, the parties contractually agreed to cut off any litigation about coverage of the first windstorm two years after the date of the windstorm. The first windstorm occurred May 1, 2011, and Northpointe did not file its complaint until February 28, 2014. Any causes of action concerning the first windstorm thus are untimely. The Court accordingly recommends granting Cincinnati's motion in part and dismissing the complaint with respect to the first windstorm.

### C. *The Second Windstorm*

Compared to the relatively straightforward situation concerning the first windstorm, the situation concerning the second windstorm raises many factual questions that should await further discovery. The parties do not dispute that the second windstorm occurred on March 3, 2012. The parties also do not dispute that they inspected the Property on March 6, 2012 and that Northpointe, through NFA, submitted some kind of loss estimate on May 24, 2012. The record is unclear, though, as to: 1) whether Northpointe provided sufficient notice under the policy, *cf., e.g., Travelers Ins. Co. v. Buffalo Reinsurance Co.*, 739 F. Supp. 209, 212 (S.D.N.Y. 1990) ("[A] contract provision that requires notice to be given within a reasonable time under the circumstances clearly allows for varying

interpretations and, therefore, the non-moving party has a right to present extrinsic evidence such as custom and usage regarding the meaning of the contested provision.") (citations omitted); 2) whether Cincinnati waived any requirements under the policy, *cf., e.g., Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988) ("Evidence of communications or settlement negotiations between an insured and its insurer either before or after expiration of a limitations period contained in a policy is not, without more, sufficient to prove waiver or estoppel. Waiver is an intentional relinquishment of a known right and should not be lightly presumed.") (citations omitted); 3) whether Cincinnati acknowledged the May 24, 2012 loss estimate by reopening its prior denial of coverage or by opening a second file; 4) why Northpointe never followed up with Cincinnati regarding any assessment of the second windstorm; 5) what the status of the second windstorm claim even is; and 6) whether and how the claims related to the second windstorm, which are timely under the complaint, can be separated from both the claims related to the first windstorm, which are not, and Northpointe's apparent delay in repairing the Property after the first windstorm. *Cf., e.g., Mawardi v. N.Y. Prop. Ins. Underwriting Ass'n*, 585 N.Y.S.2d 215, 216 (App. Div. 1992) ("Further, although it is not disputed that the windstorm was the direct cause of the initial damage to the plaintiff's property, since the plaintiff allowed the roof to remain in disrepair for several months, there exists a question of fact as to the extent of the damages which were directly caused by the

windstorm."). In pointing out these numerous unresolved issues, the Court is not necessarily criticizing the parties. Rather, the Court simply is highlighting that the case remains in its earliest stages and will benefit from formal discovery.

Summary judgment may or may not be appropriate eventually with respect to the second windstorm; for now, though, the Court can find no legal issue that would override all of the factual ambiguities noted above. The Court thus recommends denying Cincinnati's motion, without prejudice, with respect to the second windstorm.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Cincinnati's motion (Dkt. No. 6) in part and dismissing the complaint with respect to the first windstorm. The Court respectfully recommends denying Cincinnati's motion, without prejudice, with respect to the second windstorm.

As a final housekeeping matter, the Court is not sure whether Judge Arcara converted the motion to dismiss into a motion for summary judgment because he believes that the case can be scheduled for trial quickly. This Court takes no position on that issue except to recommend, based on the analysis of the second windstorm above, that the parties be allowed at least some expedited discovery to address the factual ambiguities concerning the second windstorm.

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

                                                    __/s Hugh B. Scott_____
                                                    HONORABLE HUGH B. SCOTT
                                                    UNITED STATES MAGISTRATE JUDGE

DATED: December 24, 2014